**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

David Nathanson, Gloria Nathanson,
D.N., a minor child, by his parents, David
and Gloria Nathanson, and G.N., a minor child,
by his parents, David and Gloria Nathanson,

           Plaintiffs,

v.

Spring Lake Park Panther Youth Football
Association, Phillip Richard, Kevin Johnson,
William Koschak, and Rochelle Woods,

           Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 15-1510 ADM/BRT

___

Heather M. Gilbert, Esq., Gilbert Law PLLC, on behalf of Plaintiffs.

Laurel J. Pugh, Esq., Bassford Remele, PA, Minneapolis, MN, on behalf of Defendants.

___

## I. INTRODUCTION

On May 4, 2015, the undersigned United States District Judge heard oral argument on Defendants Spring Lake Park Panther Youth Football Association, Phillip Richard, Kevin Johnson, William Koschak, and Rochelle Woods' Motion to Dismiss [Docket No. 7]. Plaintiffs David Nathanson ("David"), Gloria Nathanson ("Gloria"), and their two children, D.N. and G.N (collectively "Plaintiffs") oppose the motion.[1] For the reasons set forth below, the motion to dismiss is denied.

___

[1] The Court delayed ruling on this motion until advised by United States Magistrate Judge Becky Thorson on August 14, 2015 that settlement discussions had reached an impasse.

## II.  BACKGROUND[2]

This is a discrimination lawsuit involving four deaf individuals and a youth football association.[3] Plaintiffs are all individuals with a disability as defined by the Americans with Disabilities Act ("ADA") and primarily communicate using American Sign Language ("ASL"). Compl. [Docket No. 1-1] ¶¶ 1, 3–9.  Prior to 2014, the Blaine/Spring Lake Park Athletic Association ("Blaine Athletic Association") organized the youth football program in the Spring Lake Park area.  Id. ¶ 1.  Due to the growth of the Blaine Athletic Association, a separate football association, the Spring Lake Park Panther Youth Football Association (the "Football Association"), was created for youth who reside in Spring Lake Park or attend school in the Spring Lake Park School District.  Id. ¶¶ 1, 12, 31.

### A.  D.N. and G.N.

D.N., then age eight, began playing football with the Blaine Athletic Association in 2011. His brother, G.N., then age six, joined the Blaine Athletic Association in 2013.  Id. ¶¶ 8, 11.  In 2011 and 2012, the Blaine Athletic Association arranged and paid for ASL interpreters for D.N.'s games and practices.  Id. ¶ 24.  Beginning in 2012, the Blaine Athletic Association permitted the use of a sideline drum that was struck upon the snap of the football on each play. Id. ¶ 28.  The vibration of the drum assisted D.N. by signaling when each play started.

---

[2] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

[3] The Complaint also named as defendants four Football Association Officers.  The series of settlement conferences with Magistrate Judge Thorson held after the May 4, 2015 motion hearing resulted in the voluntary dismissal of the individual defendants.  See Pls.' Notice Voluntary Dismissal [Docket No. 32].  Only claims against the Football Association remain.

Beginning in August 2013, the Fridley School District ("Fridley"), where D.N. and G.N. attended school, provided ASL interpreters for football practices, games, and meetings under the boys' Individual Education Plan. Id. ¶ 39.  On September 11, 2014, however, Fridley determined that since the Football Association was not a Fridley Public School sponsored event, it would no longer provide interpretation services for D.N. and G.N. Id. ¶ 45.  Plaintiffs requested the Football Association to provide interpretative services for games and practices, but their requests were denied. Id. ¶ 46.  As a result, the Football Association did not provide interpretative services for D.N. and G.N.'s fall 2014 football games or practices. Id. ¶ 47.  Use of the drum was also discontinued in 2014, and as a result, D.N. and G.N. struggled to identify when plays had started. Id. ¶¶ 29, 30.

**B.  David and Gloria Nathanson**

David is a former football player and coach, having experience at the high school and collegiate levels. Id. ¶ 3.  In 2011, David was an assistant coach for D.N.'s team. Id. ¶ 25.  In May 2014, David applied for a head or assistant coaching position with the Football Association. Id. ¶ 32.  The Football Association refused to provide David with an ASL interpreter for the mandatory prospective coaches meeting. Id. at ¶ 33.  David provided his own interpreter and completed all the paperwork required to apply for the position, however, he was not offered a coaching position despite a shortage of coaches. Id. ¶¶ 34–37.

The Football Association did not secure an ASL interpreter for Gloria and David at a mandatory parent meeting held on August 11, 2014. Id. ¶ 40.  No ASL interpreter was provided by the Football Association for a September 21, 2014 board meeting. Id. ¶ 43.  Finally, the Football Association did not provide an interpreter for Gloria at its mandatory "Tackle Football

3

Mom's Clinic" in August 2014. Id. ¶ 44.

**C. Claims**

Plaintiffs contend they have suffered humiliation, embarrassment, and emotional and physical distress as a result of the Football Association's refusal to provide ASL interpreters. Plaintiffs allege violations of Title III of the ADA, 42 U.S.C. §§ 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01 *et seq*. Plaintiffs seek both monetary and equitable relief, requesting among other things, that the Football Association be required to provide ASL interpreters for its games and practices for deaf individuals.

### III. DISCUSSION

**A. Motion to Dismiss Standard**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm, 15 F.3d at 112; Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. Ossman, 825 F. Supp. at 880.

A pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Determining whether a complaint states a plausible claim for relief is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

**B.  ADA**

The Football Association argues that Plaintiffs' ADA claim must be dismissed because it is not a place of public accommodation. The Football Association contends that since it is an association that does not operate a physical place, it is not obligated to follow Title III's mandate. Plaintiffs disagree and argue that the Football Association satisfies the legal definition of a place of public accommodation because it operates or controls access to a place of public accommodation:  the football fields used for the Football Association's games and practices.

Stated broadly, Title III of the ADA, 42 U.S.C. §§ 12181–89, prohibits discrimination on the basis of disability in public accommodations operated by private entities. Section 12182(a) provides the general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The ADA provides a detailed list of private entities that are considered to be public accommodations. Those entities are:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
> (B) a restaurant, bar, or other establishment serving food or drink;
> (C) a motion picture house, theater, concert hall, stadium, or other place of

>   exhibition or entertainment;
>   (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>   (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>   (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
>   (G) a terminal, depot, or other station used for specified public transportation;
>   (H) a museum, library, gallery, or other place of public display or collection;
>   (I) a park, zoo, amusement park, or other place of recreation;
>   (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
>   (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
>   (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12191(7)(A–F). These categories are to be construed liberally to afford individuals with disabilities equal access to the establishments available to the non-disabled. PGA Tour, Inc. v. Martin, 532 U.S. 661, 676–677 (2001). The regulations implementing title III are also instructive, defining a place of public accommodation as "a facility operated by a private entity whose operations affect commerce." 28 C.F.R. § 36.104.

To prevail on a discrimination claim under Title III of the ADA, a plaintiff must show that: 1) the plaintiff is disabled within the meaning of the ADA, 2) the defendant is a private entity that owns, leases, or operates a place of public accommodation, and 3) the defendant failed to make reasonable modifications that do not fundamentally alter the nature of the public accommodation. Mershon v. St. Louis Univ., 442 F.3d 1069, 1076 (8th Cir. 2006).

An entity that is not directly connected with a physical place, such as a sports association, can meet the definition of a "place of public accommodation" See e.g., Matthews v. NCAA, 179 F. Supp. 2d 1209, 1223 (E.D. Wash. 2001) ("Title III of the ADA does apply to the NCAA");

Bowers v. Nat'l Collegiate Athletic Ass'n, 118 F. Supp. 2d 494, 515 (D. N.J. 2000) ("[T]he NCAA is an operator of a place of public accommodation under Title III"); Martin, 532 U.S. at 677 (applying ADA to Professional Golf Association's golf tours).  In Martin, the Supreme Court reasoned that since a member of the public who meets qualification prerequisites by either successfully competing in "open" qualifying rounds or by preforming well enough in a qualifying tournament can compete in a PGA tournament, each of which is open to the public, and because these events occur on a golf course, a specifically identified place of public accommodation, the PGA could not discriminate against spectators or competitors on the basis of disability.  Id. at 677, 681.  Because the PGA leased and operated the golf courses to hold its tournaments, it was prohibited from discriminating against any individual in the full use and equal enjoyment of using the golf course, including competing.  Id. at 677.

In a case similar to the matter at hand, a youth baseball association was found to be a place of public accommodation under Title III.  Shultz v. Hemet Youth Poly League, Inc., 943 F. Supp 1222, 1225 (C.D. Cal. 1996).  In that case, an 11 year old child with cerebral palsy petitioned the defendant association to be permitted to play on a baseball team designed for ballplayers aged 9-10.  Id. at 1224.  In denying the request, the association claimed that allowing the 11 year old child to "play down" would violate the rules established by the association's parent organization.  Id.  In granting the plaintiff's summary judgment motion, the district court concluded that the association was "'a place of public accommodation' under the ADA irrespective of their link to any physical facilities." Id. at 1225 (quoting Carparts Dist. Cent. v. Auto. Wholesaler's Ass'n, 37 F.3d 12 (1st Cir. 1994)).

Also instructive is Staley v. National Capital Area Council, Boy Scouts of America

where a deaf child sued the Boy Scouts for failing to provide ASL interpreters for troop trips taken to places of public accommodation. No. 10-2768, 2011 WL 2416724, at *1 (D. Md. June 9, 2011). In determining that the Boy Scouts organization was not a place of public accommodation, the court stated, "it would be inequitable to hold a membership organization whose members merely visit a place of public accommodation accountable for ADA non-compliance at those places of public accommodation, because a membership organization whose members merely patronize a public accommodation lacks the authority to correct any non-compliance." Id. at *10. Here, however, the Football Association is not merely "visiting" or "patronizing" a place of public accommodation. Rather, the Football Association uses the football fields as the primary location for its activities. The degree of involvement and control the Football Association has over the football fields is very different than the Boy Scouts taking a field trip in Staley.

The Football Association argues that it does not "operate" a place of public accommodation because it does not exercise the degree of control over the football fields like the PGA did with the golf courses in Martin or the NCAA with the stadiums in Matthews or Bowers. Plaintiffs have, however, pled sufficient facts to the contrary. Plaintiffs aver the Football Association "operates a youth football association" that "hosts football practices, games, and social events for registered participants." Compl. ¶¶ 12, 21. "Operates" has been accorded its plain and ordinary meaning of "put or keep in operation," "to control or direct the function of," or "to conduct the affairs of; manage." Tatum v. Nat'l Collegiate Athletic Ass'n, 992 F. Supp. 1114, 1121 (E.D. Mo. 1998) (citing Neff v. Am. Dairy Queen Corp., 58 F.3d 1063, 1066 (5th Cir. 1995)). Here, the Football Association's games and practices are presumably scheduled in

advance, suggesting the Football Association has an arrangement with the City of Spring Lake Park allowing access and control to the fields.[4] Although the exact relationship between the City of Spring Lake Park and the Football Association will be developed through discovery, Plaintiffs have, at the dismissal stage, plausibly stated that the Football Association operates a place of public accommodation.[5]

## C.  MHRA

The parties also dispute whether the Football Association is a place of public accommodation under the MHRA.  The Football Association argues that because it is selective about who can join and participate, it does not meet the MHRA's public accommodation definition.  Plaintiffs conclude the opposite, arguing that the analysis under the MHRA parallels the ADA.  Since the Football Association is a place of public accommodation under the ADA, Plaintiffs argue that it must also be so under the MHRA.

The MHRA also proscribes disability discrimination in places of public accommodation.

---

[4] The Football Association's argument that because it does not affect commerce it is not a place of public accommodation is unpersuasive.  Activities lacking a direct connection to interstate commerce have nonetheless been found to have a substantial effect on interstate commerce.  See Gonzales v. Raich, 545 U.S. 1, 17 (2005) ("Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce.").  The Football Association is not entitled to dismissal for this reason.

[5] In support of its motion, the Football Association submitted financial records in an effort to demonstrate the requested accommodation of providing ASL interpreters for Plaintiffs is unreasonable.  See e.g., Koschak Decl. [Docket No. 12] ¶¶ 9–12; Ex. C (showing the Football Association's finances); Richard Decl. [Docket No. 10] ¶¶ 11–13 (noting ASL interpreter fees and concluding that interpretative costs would be an undue financial burden on the Football Association).  The Court declines to convert this motion to dismiss as one for summary judgment and rule on the whether the accommodations the Plaintiffs request are reasonable or whether they fundamentally alter the nature of the services, privileges, advantages or accommodations.  See 42 U.S.C. § 12182(b)(2)(2)(ii).  This question is best answered after discovery has occurred.

Minn. Stat. § 363A.11.  "Place of public accommodation" is defined as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public."  Minn. Stat. § 363A.03, subd. 34.

"The Minnesota District Court has held that federal precedent may be used to construe the MHRA and that analysis under the ADA controls a MHRA claim."  Winslow v. IDS Life Ins. Co., 29 F. Supp. 2d 557, 567 (D. Minn. 1998) (citing Reiff v. Interim Personnel, Inc., 906 F. Supp. 1280, 1292 (D. Minn. 1995)).

In support of its position, the Football Association cites Wayne v. Mastershield, 597 N.W.2d 917 (Minn. App. 1999), for the proposition that since the Football Association is only open to youth that live or attend school in the Spring Lake Park School District, it is not a place of public accommodation.  Wayne, however, does not stand for such a sweeping premise.  In that case, the Minnesota Court of Appeals determined that an apartment complex was not a place of public accommodation because the complex was "very selective" about its membership.  Id. at 921.  Additionally, the complex did not permit unfettered access; tenants were screened and a tenant had to accompany a guest at all times.  Id.  Here, although membership in the Football Association is geographically and academically circumscribed, such limitations cannot be said to be "very selective."  Thus, Plaintiffs have plausibly alleged that the Football Association is a place of public accommodation under the MHRA.

**D. Standing**

The Football Association argues that Gloria and David Nathanson lack standing to

bring a public accommodation claim under the ADA or MHRA since the benefits provided by the Football Association are directed at the children who play football. Gloria and David respond that they have standing to assert their claims because they are trying to avail themselves of the privileges and advantages of the Football Association.

The Football Association cites Bauer v. Muscular Dystrophy Ass'n, Inc., in support of its position. 268 F. Supp. 2d 1281 (D. Kan. 2003), aff'd, 427 F.3d 1326 (10th Cir. 2005). In that case, two disabled individuals were prohibited from volunteering at a summer camp for children with muscular dystrophy because of a policy requiring all volunteers to be able to "lift and care for a camper." Id. at 1282. Recognizing that the claims more closely resemble an employment situation actionable under Title I of the ADA, the district court held that "the plaintiffs are not individuals who have been denied the 'enjoyment' of the 'goods, services, facilities, privileges, advantages, or accommodations' of a place of pubic accommodation within the meaning of Title III of the ADA." Id. at 1290–91. The district court buttressed its conclusion by discussing Martin, reasoning that the "'privileges' guaranteed by Title III meant only those privileges offered to customers or patrons of the public accommodation," and that "individuals who work at places of public accommodation, and who would perform tasks for and under the direction and control of an owner or operator of a public accommodation, are not 'clients or customers' of the public accommodation." Id. at 1292. Since the plaintiffs were denied the ability to volunteer their services, they were more appropriately considered to be workers performing tasks for and under the direction and control of the camp, rather than as clients or customers of the camp.

If Gloria and David's claims were limited to being denied the ability to volunteer, as characterized by the Football Association, Bauer would likely be dispositive of their claims. The

11

averments in the Complaint, however, are not so limited. Gloria avers she was unable to fully participate in mandatory meetings because the Football Association failed to provide ASL interpreters. Compl. ¶¶ 40, 43, 44. David similarly alleges he was denied the ability to participate in mandatory meetings because of his disability. Id. ¶ 43. For purposes here, Gloria and David's involvement with the mandatory meetings is closer factually to that of a client or customer rather than an employee or worker. As such, Gloria and David are entitled at this stage of litigation to proceed to enforce the protections of Title III of the ADA.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Spring Lake Park Panther Youth Football Association, Phillip Richard, Kevin Johnson, William Koschak, and Rochelle Woods' Motion to Dismiss [Docket No. 7] is **DENIED**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 10, 2015.